Filed 7/21/22  P. v. Kozee-Stoltz CA4/1
Opinion following transfer from Supreme Court

OPINION AFTER TRANSFER FROM THE CALIFORNIA SUPREME COURT

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JORDAN PAUL KOZEE-STOLTZ et al.,<br><br>    Defendants and Appellants. | D069073<br><br><br>(Super. Ct. No. SWF1201090) |

APPEALS from judgments of the Superior Court of Riverside County, Albert J. Wojcik, Judge.  Affirmed in part, reversed in part, and remanded for further proceedings.

Wallin & Klarich and Stephen D. Klarich for Defendant and Appellant Jordan Paul Kozee-Stoltz.

Professional Law Corp. and Susan K. Shaler for Defendant and Appellant Christopher A. Newsome.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A.

Sevidal, Paige B. Hazard, Lynn G. McGinnis, Susan E. Miller, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jordan Paul Kozee-Stoltz and Christopher Alexander Newsome (together defendants) of attempting to murder Brylowe P. and Trenton B. and found true the allegations that the attempted murder was willful, deliberate and premeditated. (Pen. Code, §§ 187, subd. (a), 664, subd. (a).)[1] The jury also convicted defendants of second degree robbery (§ 211), willfully discharging a firearm at an occupied motor vehicle (§ 246), and street terrorism (former § 186.22, subd. (a)). The jury found true that gang enhancements (former § 186.22, subd. (b)(5)) applied to all but the street terrorism charge. Newsome admitted a prior strike conviction. The court sentenced Stoltz to a determinate sentence of 13 years plus an indeterminate sentence of 30 years-to-life in prison and Newsome to a determinate sentence of 20 years and an indeterminate sentence of 60 years-to-life.

Defendants appealed, contending the trial court erred: (1) in declaring Trenton to be an unavailable witness; (2) allowing uncorroborated accomplice testimony; (3) instructing the jury as to the street terrorism charge and gang enhancements; (4) by failing to give a unanimity instruction; (5) instructing the jury on attempted murder and the willfulness sentencing enhancement attached to this count; (6) by denying their request to instruct the jury it should consider an accomplice's plea bargain when assessing the accomplice's credibility; (7) not staying the robbery sentence; and (8) imposing consecutive sentences. Defendants contend that the cumulative effect of the above errors

---

[1]     Undesignated statutory references are to the Penal Code.

prejudiced them. Finally, defendants asked us to independently review sealed mental health evaluations.

In an unpublished opinion issued in March 2016, we reversed the street terrorism charge and the gang enhancements attached to the remaining charges and remanded the matter for resentencing. We otherwise rejected defendants' arguments and affirmed the judgments. Newsome petitioned our Supreme Court for review. The Supreme Court granted review and deferred the matter "pending consideration and disposition of a related issue in *People v. Mateo*, S232674 . . ., or-pending further order of the court." In the meantime, our Legislature enacted Senate Bill No. 1437 (Sen. Bill 1437) (2017-2018 Reg. Sess.), which "amend[s] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder." (Stats. 2018, ch. 1015, § 1, subd. (f).)

Our Supreme Court remanded the matter to us with directions to vacate our decision and reconsider the cause in light of Sen. Bill 1437. We received and considered supplemental briefing on the issue. We concluded that the impact of Sen. Bill 1437 on defendants' convictions needed to be assessed by the trial court in the first instance. Accordingly, we vacated our original opinion issued March 17, 2016, and issued a revised unpublished opinion on August 5, 2019, addressing defendants' arguments in section III.C. and newly added section IV.

The California Supreme Court granted and held petitions for review filed by defendants regarding the impact of Sen. Bill 1437. In October 2021, while this case was pending in the Supreme Court, the Governor signed into law Senate Bill No. 775 (Sen. Bill 775) (2021-2022 Reg. Sess.), which

3

amended section 1170.95[2] by expanding the scope of individuals entitled to seek resentencing relief to include individuals who had been convicted of attempted murder or manslaughter under a theory of felony murder and the natural and probable consequences doctrine. (Stats. 2021, ch. 551, § 2; former § 1170.95, subd. (a); *People v. Montes* (2021) 71 Cal.App.5th 1001, 1006.) Sen. Bill 775 also added a new subdivision to former section 1170.95 which states: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 . . . ." (Former § 1170.95, subd. (g).) In December 2021, the Supreme Court transferred the matter to this court with directions to vacate the decision and reconsider in light of Sen. Bill 775.

Defendants filed supplemental briefs addressing the impact of Sen. Bill 775, contending that their convictions for attempted murder required reversal because the trial court instructed the jury on the now invalid natural and probable consequences doctrine for aider and abettor liability. Newsome also contends that retrial is barred because no legally sufficient evidence under a valid theory of guilt supported the attempted murder convictions. The People agree that defendants' convictions for attempted murder must be reversed but disagree with Newsome's contention that retrial is barred. As we shall explain, we agree with the People.

Defendants also addressed the impact of Assembly Bill No. 333 (Assem. Bill 333) (2021-2022 Reg. Sess.), which the Legislature enacted while this

---

[2] Effective June 30, 2022, section 1170.95 was recodified without substantive change in section 1172.6, pursuant to Assembly Bill No. 200. (Stats. 2022, ch. 58, § 10.) We refer to this section as former 1170.95.

case was pending.[3]  Assem. Bill 333 amended section 186.22 "to require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343 (*Lopez*).)  Assem. Bill 333 also added section 1109 requiring bifurcation of gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense.  (Stats. 2021, ch. 699, § 5.)

In our original opinion, we reversed the street terrorism charge and the gang enhancement allegations attached to the remaining charges based on instructional error.  (*People v. Kozee-Stoltz, et al.* (Mar. 17, 2016, D069073) [nonpub. opn.].)  The street terrorism charge and the gang enhancement allegations remain reversed.  Given the passage of Assem. Bill 333, defendants now contend that retrial is barred because insufficient evidence supports the street terrorism count and the gang enhancements.[4]  They also argue that new section 1109 requires that the entire judgment against them be reversed and the matter retried without the admission of the gang-related evidence.  The People disagree with these contentions and we again agree with the People.

We vacate our opinion issued August 5, 2019, and now reissue that opinion, addressing defendants' new arguments in new sections I and II, and

---

[3]  After the Supreme Court remanded this matter, we directed the parties' attention to this court's Misc. Order No. 021422 issued on February 14, 2022, which allows parties to file supplemental briefing on recently enacted laws effective January 1, 2022, that may affect criminal judgments under review by this court.  To the extent the parties concluded that any of the recently enacted laws referenced in Misc. Order No. 021422 were relevant to this appeal, we allowed the parties to brief these issues.

[4]  We granted Newsome's motion to join Stoltz's arguments regarding application of Assem. Bill 333.

eliminating the discussion of some issues that have since been rendered moot.

## FACTUAL AND PROCEDURAL BACKGROUND

On an evening in April 2012, Brylowe and Trenton were driving around in Trenton's Chevy Impala when Trenton decided to purchase marijuana from Juwan C. After arriving at a residence in Temecula, Trenton got out of the Impala and Brylowe stayed inside. Juwan and Trenton discussed marijuana quality and prices and Juwan then left for a couple of minutes.

Juwan returned in a Dodge Charger driven by Stoltz. Juwan sat in the back of the Charger and Newsome was the front passenger. Juwan had Trenton get into the backseat of the Charger. Stoltz, Newsome and Juwan each pointed a gun at Trenton. Juwan and Stoltz demanded money and told Trenton, "We're Yarbrough Park Crips and we kill people." Juwan and Stoltz searched Trenton's pockets. Stoltz took Trenton's wallet and Juwan took Trenton's wristwatch and a few dollars. Juwan and defendants then walked Trenton back to the Impala at gunpoint.

Trenton ran toward the Impala and yelled at Brylowe to drive. Trenton got into the Impala and Brylowe sped off. Stoltz followed in the Charger with Newsome and Juwan. Gunfire erupted from the Charger with some bullets hitting the Impala. Eventually, a police car pulled over the Impala.

In the meantime, Stoltz turned the Charger into a residential neighborhood, Juwan got out of the car, wrapped the three guns in his jacket and hid them in a bush. Another police car later pulled over the Charger. Among other things, police found Trenton's wallet in the backseat of the Charger. There were also entry and exit bullet holes on the driver's side hood of the Charger. No weapons were found inside the Charger. At an in-field lineup, Trenton identified Stoltz as the driver of the Charger and Juwan as

6

the man in the backseat.  Trenton could not identify Newsome.  Police found multiple bullet holes in the Impala.  After being taken into custody, Juwan led police to the guns.  The police found the guns wrapped in a sweater underneath a bush.

## DISCUSSION

I. *Defendants' Attempted Murder Convictions and Premeditation Allegations Must Be Reversed*

A. *Sen. Bill 1437 and Sen. Bill 775*

"Our law recognizes two forms of liability for aiders and abettors. [Citation.]  First, under direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.'  [Citation.]  [¶]  Second, under the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense)."  (*People v. Gentile* (2020) 10 Cal.5th 830, 843 (*Gentile*).)

Sen. Bill 1437 amended section 188 to provide in subdivision (a)(3) that, except as provided in section 189, subdivision (e), which governs felony murder, "in order to be convicted of murder, a principal in a crime *shall act with malice aforethought*.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (*Gentile, supra,* 10 Cal.5th at p. 846.)  As amended, section 188, subdivision (a)(3), also "bars a conviction for first or second degree murder under a natural and probable consequences theory."  (*Gentile*, at p. 846.)  The bill also "added section [former] 1170.95 to

7

provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief. . . .” (*Id.* at p. 843.)

In our August 2019 opinion, we concluded whether defendants are entitled to relief under Sen. Bill 1437 had to be considered in the first instance by the sentencing court pursuant to the procedures provided in former section 1170.95. Likewise, our Supreme Court held in *Gentile*, *supra*, 10 Cal.5th 830, that “[t]he ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under [former] section 1170.95.” (*Id.* at pp. 851–852.)

Effective January 1, 2022, Sen. Bill 775 amended former section 1170.95 by adding subdivision (g) to the statute. This subdivision provides the following: “A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018).” (Former § 1170.95, subd. (g).) Subdivision (g) supersedes *Gentile’s* holding that Sen. Bill 1437’s ameliorative provisions do not apply on direct appeal (see *Gentile*, *supra*, 10 Cal.5th at p. 839), and allows defendants to challenge the validity of their convictions under the amended law in this appeal. (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 584.) Sen. Bill 775 also amended former section 1170.95 to expressly encompass attempted murder and manslaughter. (Former § 1170.95, subd. (a); see also *id.*, subd. (d)(1).) Thus, “[Sen. Bill] 775 eliminates the natural and probable consequences doctrine as a basis to prove an accomplice committed attempted murder.” (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196 (*Sanchez*).)

8

B. Analysis

Attempted murder requires "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Booker* (2011) 51 Cal.4th 141, 177–178 (*Booker*).) "[U]nlike murder, attempted murder is not divided into degrees. The prosecution, though, can seek a special finding that the attempted murder was willful, deliberate, and premeditated, for purposes of a sentencing enhancement." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605; see *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1049 ["attempted murder is not a lesser included offense of attempted premeditated murder, but premeditation constitutes a penalty provision that prescribes an increase in punishment"].) If committed with premeditation and deliberation, attempted murder is punishable by a life term, i.e., seven years to life in prison. (§§ 664, subd. (a); 3046, subd. (a).)

Here, the trial court instructed the jury that it could find defendants guilty of attempted murder (CALJIC No. 8.66) as a direct aider and abettor (CALJIC No. 3.01), or as an aider and abettor under the natural and probable consequences doctrine. (CALJIC No. 3.02). The jury was not instructed that it had to unanimously agree on a particular theory.

The prosecutor argued that defendants could be found guilty of attempted murder in three ways: (1) by directly committing the crime; (2) by aiding and abetting the crime; and (3) under the natural and probable consequences doctrine. The prosecutor initially argued:

> "And when Trenton . . . took off running, they took that as a sign of disrespect to the gang. They were angry about the money and they didn't just let it go. They followed with the attempted murder of that man because of that disrespect. And it was a natural and probable consequence of the

9

robbery. And it was the way they would be expected to respond as members of the Yarborough Park Crips."

At the end of rebuttal argument, the prosecutor again argued the natural and probable consequences doctrine:

"And during the course of that robbery things go south; and they respond how? As any member or any gangster would respond when disrespected. If somebody puts up resistance during that robbery, a definite foreseeable and natural [and] probable consequence is to deal with that individual . . . . And, in doing so, they committed all of the crimes that they are charged with."

The jury returned general verdicts finding defendants guilty of two counts each of attempted murder and found true the attached allegation that the attempted murders were willful, deliberate, and premeditated.

The parties agree, and we concur, that in light of Sen. Bill 1437 and Sen. Bill 775, the natural and probable consequences doctrine is no longer a valid theory of liability for attempted murder. (*Sanchez*, *supra*, 75 Cal.App.5th at p. 196.) Thus, the trial court instructed on what is now a legally invalid theory. (*Ibid.*) This error is subject to the harmless error test set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Aledamat* (2019) 8 Cal.5th 1, 9.) "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id.* at p. 13.)

The People concede that the record here does not show beyond a reasonable doubt that the jury did not rely on the invalid theory in finding defendants guilty. The attempted murder instruction informed the jury that to prove attempted murder the following elements must be proven: "1. A direct but ineffectual act was done by *one person* towards killing another

10

human being; and 2. *The person committing the act* harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being." (CALJIC No. 8.66, italics added.) This instruction did not require that the jury find that "the defendant" harbor the intent to kill, which is required to find a defendant guilty of attempted murder as either the perpetrator or as a direct aider and abettor. (See *Booker*, *supra*, 51 Cal.4th at pp. 177–178.) Similarly, the jury instruction on the attached premeditation allegation did not require that each defendant harbor the intent to kill. (CALJIC No. 8.67.) Thus, the jury's premeditation findings attached to the attempted murder counts are insufficient to conclude the instructional error was harmless beyond a reasonable doubt. On this record, we cannot conclude as a matter of law that the jury found that each defendant harbored the intent to kill. Accordingly, each defendant's attempted murder convictions must be reversed.

Because we reverse defendants' convictions for attempted murder as charged in counts 1 and 2, the true finding on the premeditation allegation attached to those counts must be vacated as allegations attached to an underlying felony are not separate crimes and cannot stand alone. (See *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1311 [separating convictions from their attendant enhancements is unauthorized by law].)

Newsome contends that retrial of the attempted murder counts is barred because the evidence is insufficient to sustain his convictions as a direct aider and abettor.[5] We disagree.

---

[5] Stoltz similarly suggests that retrial is barred by arguing that the matter should be remanded for resentencing on the crimes other than the attempted murder convictions.

11

"[W]hen a defendant's conviction is reversed by an appellate court on the sole ground that the evidence was insufficient to sustain the jury's verdict, the Double Jeopardy Clause bars a retrial on the same charge." (*Lockhart v. Nelson* (1988) 488 U.S. 33, 39.) "It has long been settled, however, that the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." (*Id.* at p. 38.)

As our high court explained 40 years ago, the double jeopardy rule "achieves its aim—i.e., of protecting the defendant against the harassment and risks of unnecessary repeated trials on the same charge—by the device of giving the prosecution a powerful incentive to make the best case it can at its first opportunity. [Citation.] But the incentive serves no purpose when, . . ., the prosecution did make such a case under the law as it then stood; having done so, the prosecution had little or no reason to produce other evidence of guilt." (*People v. Shirley* (1982) 31 Cal.3d 18, 71, superseded by statute on other grounds, as explained in *People v. Alexander* (2010) 49 Cal.4th 846, 879.) Under such circumstances " 'reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case.' [Citation.] Rather, the matter is governed by the settled rule that the double jeopardy clause does not prohibit retrial after a reversal premised on error of law." (*Shirley*, at p. 71; *People v. Perez* (2022) 78 Cal.App.5th 192, 205 (*Perez*) [concluding that double jeopardy is not implicated where Sen. Bill 775 required reversal of attempted murder convictions]; *People v. Hola* (2022) 77 Cal.App.5th 362, 376 ["[W]hen there is a change in the law during an appeal that invalidates a previously valid legal

12

theory relied upon by prosecution and reversal is thereby warranted, a new trial should be permitted on legally valid theories."].)

On remand, the prosecution may elect to retry defendants for attempted murder on a still-valid theory, or it may forego that option, in which case defendants would be entitled to a new sentencing hearing.

## II. *Impact of Assem. Bill 333*

### A. *Assem. Bill 333 Amendments to Section 186.22*

Effective January 1, 2022, Assem. Bill 333 "amends section 186.22 to require proof of additional elements to establish a gang enhancement." (*Lopez*, *supra*, 73 Cal.App.5th at p. 343.) When appellants were tried, former section 186.22 defined a " 'criminal street gang' " as "any ongoing organization, association, or group of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) Assem. Bill 333 narrowed the definition to "an ongoing, organized association or group of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.) This change requires that the People "prove that two or more gang members committed each predicate offense." (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1072; accord, *Lopez*, at pp. 344–345.)

Under the former version of section 186.22, the phrase "pattern of criminal gang activity" was defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [specified] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense,

13

and the offenses were committed on separate occasions, or by two or more *persons*." (Former § 186.22, subd. (e), italics added.)

Assem. Bill 333 changed this definition. Now, the predicate offenses must have been committed by two or more "members" of the gang (as opposed to any persons) and must have "*commonly* benefited a criminal street gang" and "the common benefit of the offense [must be] more than reputational." (§ 186.22, subd. (e)(1), italics added.) Additionally, at least one of these predicate offenses must occur after the effective date of this chapter, and the last of those offenses must have occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed. (*Ibid.*) The currently charged offense no longer counts as a predicate offense. (§ 186.22, subd. (e)(2).) The new law also reduced the number of qualifying offenses that can be used to establish a pattern of criminal gang activity, removing vandalism, looting and several fraud-related offenses from the list. (§ 186.22, subd. (e)(1)(A)-(Z).)

Assem. Bill 333 requires the prosecution to prove the benefit the gang derives from the current offenses is "more than reputational." (Stats. 2021, ch. 699, § 3 [enacting § 186.22, subd. (g)].) "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).) Finally, Assem. Bill 333 added section 1109 requiring bifurcation of gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense. (Stats. 2021, ch. 699, § 5.) The defendant's guilt on the underlying offense must first be determined, and a trial on the gang

14

enhancement is held if the defendant is first found guilty of the underlying offense.  (§ 1109, subds. (a)(1) & (a)(2).)

B.  Analysis

Defendants acknowledge that we previously reversed their street terrorism convictions and vacated the gang enhancement allegations based on instructional error.  They contend that new section 1109 requires that the entire judgment against them be reversed and the matter retried without the admission of the gang-related evidence.  The People contend that this contention was forfeited by not requesting bifurcation below, that section 1109 operates prospectively only, and that even if bifurcation was required, any error was harmless.

We need not decide here whether section 1109 operates retroactively, or whether defendants forfeited this claim of error by failing to request bifurcation at trial, because even assuming retroactive application[6] and no forfeiture, the failure to bifurcate in this case is harmless error whether considered under the standard of *Watson* or *Chapman*.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [state law error requires reversal only if it is reasonably probable that the error had an effect on the verdict]; *Chapman*, *supra*, 386 U.S. at p. 24 [reversal is required under the federal Constitution unless the error was harmless beyond a reasonable doubt]; see *Ramos*, *supra*, 77 Cal.App.5th at p. 1131 [defendant not entitled to reversal of his conviction under *Watson* because he was not harmed by the failure to bifurcate gang

---

[6]    Courts are divided on whether section 1109 is retroactive.  (*People v. Burgos* (2022) 77 Cal.App.5th 550 (*Burgos*); *People v. Ramos* (2022) 77 Cal.App.5th 1116 (*Ramos*); but see *Burgos*, at p. 569 (dis. opn. of Elia, J.) [contending that section 1109 is not retroactive]; *Perez*, *supra*, 78 Cal.App.5th at p. 207 [section 1109 is not retroactive]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [same].)

enhancement]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480) [concluding the failure to bifurcate was harmless under *Watson* because verdict was not based on improper bias but on strong evidence defendant committed the charged offenses].)

Here, the prosecution presented overwhelming evidence of defendants' involvement in the robbery and shooting at an occupied vehicle without any gang evidence.[7] Before the robbery, defendants and Juwan discussed the plan to "rip off" Trenton, with Juwan using defendants as back-up. Defendants pointed their guns at Trenton and Stoltz demanded money. Stoltz then searched Trenton's pockets and took Trenton's wallet. In the meantime, Juwan told Newsome to get out of the car "and go get the money." Juwan saw Newsome walk toward the Impala as Newsome aimed his gun through the driver's side window and asked for money.

After Stoltz completed the robbery, Trenton escaped in the Impala with Brylowe while Stoltz followed in the Charger with Newsome and Juwan. Gunfire erupted from the Charger with some bullets hitting the Impala. Juwan testified that Stoltz steered the Impala with one hand and had a gun in his other hand. Stoltz fired four or five shots at the Charger with Trenton and Brylowe inside. Newsome also pulled the trigger of his gun but his gun jammed and he then tried to fix it. Assuming Newsome never actually fired his weapon, the evidence supports his conviction for shooting at an occupied vehicle as an aider and abettor.

---

[7] As previously noted, defendants' convictions for attempted murder and street terrorism are reversed. On remand, should the People decide to retry these charges, defendants can ask the trial court to bifurcate the gang enhancement allegations and the street terrorism count under section 1109.

16

Additionally, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Here, most of the gang-related evidence would have been admissible under Evidence Code section 1101 to illuminate the motive for the crimes. (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) As Stoltz pointed his gun at Trenton and demanded money, he and Juwan told Trenton, "We're Yarbrough Park Crips and we kill people." The gang expert testified that gang members put in work for the gang by, among other things, committing robberies.

Finally, the trial court instructed the jury with CALJIC No. 17.24.3 to not consider evidence showing criminal street gang activities, and criminal acts committed by other gang members "to prove that defendant is a person of bad character or that [he] has a disposition to commit crimes." We presume that the jurors followed the trial court's instructions in the absence of any evidence to the contrary. (*People v. Krebs* (2019) 8 Cal.5th 265, 335.) There is no evidence suggesting the jurors were unable or unwilling to follow the court's instruction.

On this record, even assuming section 1109 applies retroactively and defendants did not forfeit the issue by failing to request bifurcation before trial, they were not prejudiced by the failure to bifurcate the gang

17

enhancement allegations from their trial on the underlying substantive offenses.[8]

Defendants next assert that retrial of the street terrorism charge and the gang enhancement allegations is barred because the prosecution failed to present sufficient evidence. We disagree.

Not surprisingly, the People originally tried this matter based on the law then in existence. Assem. Bill 333 has since established greater proof requirements for gang crimes and enhancements. (See 2021-2022 Reg. Sess., Stats. 2021, ch. 699.)[9] Defendants contend that the evidence adduced at their trial failed to satisfy these new requirements, which became effective on

---

[8] In *Burgos, supra,* 77 Cal.App.5th 550 a divided appellate court held that section 1109 applies retroactively. (*Id.* at p. 568.) The *Burgos* majority also concluded that the failure to bifurcate the gang enhancements in that case "likely" constituted " 'structural error' because it 'def[ies] analysis by harmless-error standards.' " (*Ibid.*) On the instant record, we cannot conclude that the failure to bifurcate amounted to structural error because it is possible to determine whether it is reasonably probable defendants would have obtained a more favorable result if their trial had been bifurcated pursuant to section 1109. (See *Ramos, supra,* 77 Cal.App.5th at p. 1131, citing *Watson, supra,* 46 Cal.2d at p. 836.) Defendants have not identified any evidence that would have been withheld until the gang enhancement phase of a bifurcated trial or how the failure to withhold such evidence amounted to structural error that defies analysis by harmless-error standards. Accordingly, we disagree with the concern voiced by the *Burgos* majority that it can be "difficult to determine how the outcome of the trial would have been affected if [the proceeding] had been bifurcated to try the gang enhancements separately" (*Burgos,* at p. 568) because bifurcation in this case would not have drastically changed the nature of the instant proceeding.

[9] The People concede, and we agree, that the balance of the amendments to section 186.22 apply retroactively to this matter. (*Lopez, supra,* 73 Cal.App.5th at p. 344.)

18

January 1, 2022. The People concede, and we agree, that the evidence presented at trial did not satisfy the new requirement that predicate offenses commonly benefited the Yarborough Park Crips gang in a manner that is more than reputational. (§ 186.22, subd. (e)(1).) We also note that the jury instruction pertaining to the gang enhancement allegations did not conform to amended section 186.22 because it allowed the jury to find the allegation true: (1) if an *individual* gang member engaged in a pattern of criminal gang activity; (2) if two or more *persons* committed the predicate offenses; (3) if the predication offense did not commonly benefit the gang; (4) even if the benefit to the gang was not more than reputational; (5) even if at least one of the predicate offenses did not occur after the effective date of this chapter; and (5) for a vandalism predicate offense. (CALJIC 17.24.2.) (Compare, § 186.22, subds. (e), (f) & (g).)

Nonetheless, we reject defendants' assertion that the prosecution is barred from retrying the street terrorism charge and gang enhancement allegations. "Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence." (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 72; see also, *People v. Sek* (2022) 74 Cal.App.5th 657, 669 [reversal not based on insufficiency of the evidence required to prove statutory violation as statute read at the time of trial does not bar retrial under double jeopardy clause].) Similarly, our prior reversal of defendants' street terrorism convictions and the true findings on the gang enhancement allegations based on instructional error does not bar retrial. (*People v. Hallock* (1989) 208 Cal.App.3d 595, 607

["If reversal is predicated on instructional error, . . . double jeopardy principles do not come into play"].)[10]

### III. *Admission of Trenton's Prior Testimony*

A. Background

The prosecution moved in limine to have Trenton declared unavailable and to admit his preliminary hearing testimony. At the Evidence Code section 402 hearing, Terese Workman and Todd Marty from the Riverside County District Attorney's Office testified. With trial scheduled to begin the following month, Workman received Trenton's subpoena on December 10, 2013. After determining that Trenton did not have a criminal history, she searched the DMV system and located an address. The following day, she went to the address and spoke to Trenton's father. Trenton's father did not know where Trenton lived. Workman checked for Trenton on another law enforcement system and on Facebook. She identified Trenton's girlfriend,

---

[10] Defendants make a multi-faceted argument that Assem. Bill 333 rendered their other convictions unconstitutional. They assert that California's Street Terrorism Enforcement and Prevention Act (STEP Act, § 186.20 et seq.) is discriminatory in its enforcement. They next claim that their convictions violate the First Amendment right to free association. They also claim that their convictions violate due process because the substantive crimes were tried together with the gang enhancement allegations and the street terrorism charge.

As we already explained, any error in trying the substantive crimes together with the street terrorism charge and gang enhancement allegations was harmless. Accordingly, we reject defendants' arguments that a unified trial rendered their remaining convictions for robbery and shooting at an occupied vehicle unconstitutional. If the People opt to retry the attempted murder charges, and the street terrorism charge and gang enhancement allegations, that trial would be subject to section 186.22 as amended by Assem. Bill 333, including section 1109 which requires bifurcation if requested by defendants.

Janee B., and a former employer and located an address in San Diego. The former employer did not have a forwarding address or contact information for Trenton.

On December 26, 2013, Workman visited Trenton's mother and grandmother at a residence in Murrieta. She learned that Trenton had been at the home the previous day to celebrate Christmas, but left that same day. Trenton's mother did not have an address for him. Trenton's mother said she would call Trenton and his girlfriend and leave a message, telling him to call Workman.

On January 16, 2014, Marty checked an address where one of Trenton's relatives might have been living. Marty located Janee at another address, who called Trenton on her cell phone while Marty was there. Marty talked to Trenton on Janee's cell phone. Trenton told Marty that he was in Avondale, Arizona. Trenton gave Marty two cell phone numbers and his address in Rancho, California. When Marty tried to contact Trenton, the numbers that Trenton had given him were out of service. Marty called Janee twice and left two messages, but he never heard back from her. Marty went to the address in Rancho, California, but the residents did not know Trenton. Marty discovered that Trenton had a court hearing scheduled in January. Marty called the court's reference phone number for Trenton and spoke to Trenton who said he was still in Arizona and did not want to testify. Marty ran checks on two license plate numbers associated with Trenton, but they both came back negative.

After hearing argument from counsel, the trial court ruled that Trenton was unavailable and allowed the prosecution to present Trenton's prior testimony. The court directed the District Attorney's office to make efforts to

locate Trenton in Arizona and to try and contact Trenton if he showed up for his scheduled court appearance.

Trenton did not show up for his scheduled court appearance. Workman testified that she had attempted to contact Trenton in Avondale, Arizona by calling the Avondale police department, but it had no record of him. She also checked a database for information on an Arizona address for either Trenton or his possible associates, but found nothing. Workman called the phone number where Marty had previously reached Trenton, but it was no longer in service.

Defense counsel renewed their objection to Trenton's preliminary hearing testimony being read into the record. The court, however, confirmed its prior ruling.

B. Analysis

Defendants contend the prosecutor failed to show due diligence in attempting to locate Trenton and claim the court's admission of Trenton's preliminary hearing testimony violated their Sixth Amendment right to confrontation. We disagree.

A criminal defendant has a constitutional right to confront prosecution witnesses, but the right is not absolute. (*People v. Cromer* (2001) 24 Cal.4th 889, 892.) "An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination." (*Ibid.*) Under this exception, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right. (*People v. Herrera* (2010) 49 Cal.4th 613, 621; Evid. Code, § 1291, subd. (a)(2).) A witness is unavailable when the witness is absent from the hearing and the proponent of the witness's testimony has exercised reasonable diligence, but has been

22

unable to procure the witness's attendance by the court's process. (Evid. Code, § 240, subd. (a)(5).) We independently review the prosecution's claim of good faith and reasonable diligence. (*Herrera*, at p. 623.) Factors we consider in determining whether the prosecutor has shown reasonable diligence include the timeliness of the search, the importance of the witness's testimony, and whether leads to the witness's possible location were reasonably explored. (*People v. Thomas* (2011) 51 Cal.4th 449, 500.)

On October 22, 2013, the court set the matter for trial on January 9, 2014. The prosecution began looking for Trenton on December 10, 2013, 42 days before trial started on January 21. Defendants complain the prosecution presented no evidence it communicated with Trenton after the preliminary hearing and did not timely begin its search for Trenton as it knew Trenton was a reluctant witness.

A prosecutor is not required " 'to keep "periodic tabs" on every material witness in a criminal case,' " but must take adequate preventative measures to stop a witness from disappearing when the prosecutor has knowledge of a substantial risk that an important witness will flee. (*People v. Friend* (2009) 47 Cal.4th 1, 68.) Here, the evidence shows Trenton voluntarily appeared at the preliminary hearing with the enticement that the car impounded after the incident would then be released if he cooperated. Thus, while Trenton can be described as a reluctant witness, the prosecutor had no obligation to keep in periodic contact with him and defendants pointed to no evidence in the record suggesting the prosecutor had knowledge of a substantial risk that Trenton would disappear.

Moreover, the prosecution started searching for Trenton 42 days before the scheduled trial date, this does not constitute an unreasonable delay. (*People v. Fuiava* (2012) 53 Cal.4th 622, 675–676 [search for witness

reasonably commenced two weeks before the start of trial].) Significantly, there is no indication in the record that starting the search earlier would have made any difference in the prosecution's ability to procure Trenton's attendance at trial. Not discussed by defendants is the fact that the prosecution investigators spoke to Trenton, who indicated he was in Avondale, Arizona and did not want to come to court to testify. At that time, Trenton provided an address in Rancho, California that turned out to be false. Trenton refused to disclose where he was staying in Arizona or who he was staying with.

While it appears Trenton came to court on another matter, there is no indication the prosecution had any advance knowledge he would appear as the record shows he could have added himself to the calendar by calling, faxing or having an attorney appear. When the prosecution learned that Trenton had a scheduled court date, it had investigators waiting for him, but he never appeared. The prosecution searched for Trenton in Arizona by calling the Avondale police department and checking a database for an address or possible associates, but had no success. Defendants note that Trenton appeared at his parents' home on Christmas day and criticize the prosecution for not having investigators waiting there. That day, however, Trenton could have been with his girlfriend and child in San Diego. " 'The law requires only reasonable efforts, not prescient perfection.' " (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

"[W]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence … but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." (*Hardy v. Cross* (2011) 565 U.S. 65, 71-72 [132 S.Ct. 490, 495].) It is

speculative to assume that if the prosecution had pursued any other leads, it would have procured Trenton's presence at trial. Trenton failed to appear for a scheduled court date and there is no guarantee that, even if the prosecution had served him with a subpoena, he would have appeared for trial given Trenton's statement that he did not want to testify. It seems Trenton "purposely made [him]self unavailable because [he] was unwilling to testify." (*People v. Diaz, supra*, 95 Cal.App.4th at p. 706.)

We reject Newsome's suggestion that he had a different interest and motive in cross-examining Trenton at the preliminary hearing than at trial and his criticism that counsel did not explore all credibility issues at the preliminary hearing. The trial court here could have reasonably concluded that defendants had much the same interest, motive, and opportunity to cross-examine Trenton at the preliminary hearing as at trial. (*People v. Valencia* (2008) 43 Cal.4th 268, 294 [interest and motive to cross-examine need not be identical, only " 'similar' "].) That Newsome would have preferred more cross-examination during the preliminary hearing is not the test of confrontation. (*People v. Carter* (2005) 36 Cal.4th 1114, 1173–1174.)

The totality of the circumstances support the conclusion that the prosecution exercised reasonable diligence to locate Trenton; accordingly, the trial court did not err in allowing Trenton's preliminary hearing testimony to be read to the jury.

IV. *Accomplice Corroboration*

A. Background

Juwan testified that he was currently in custody for attempted murder arising from the incident and he had an agreement to testify truthfully in exchange for a sentence of 18 years in prison. Juwan claimed that he had intended to sell Trenton $2,000 worth of cocaine that had been cut with

25

baking soda. Via text message, Juwan and Stoltz agreed to a plan for Trenton. Juwan had Stoltz bring a gun himself and a .25 caliber handgun for Juwan. Stoltz picked Juwan up in a Charger. Newsome was in the front passenger seat and Juwan sat in the backseat. Juwan had the .25 caliber gun in his pocket. Newsome had a .380 caliber gun and Stoltz had a .45 caliber gun.

Trenton got into the Charger and claimed he did not have any money. The three men then pulled out their guns and pointed them at Trenton's head. Trenton told Juwan the money was in his car. Juwan and Stoltz took Trenton's wallet and watch, and Juwan ordered Trenton out of the car. Trenton ran to the Impala and the car took off. Juwan, Stoltz, and Newsome gave chase in the Charger. Juwan and Stoltz fired their guns at the Impala. Newsome tried to fire his gun but it had jammed and he could not clear the jam. After police pulled over the Impala, Stoltz turned into a residential neighborhood. Newsome and Stoltz handed Juwan their guns and Juwan put all three guns in his jacket and put the jacket with the guns in a bush.

B. Analysis

Defendants contend their attempted murder convictions must be reversed because these convictions were based upon Juwan's uncorroborated accomplice testimony that defendants fired a gun or attempted to fire a gun at Brylowe and Trenton. We disagree.

A conviction cannot be based only on accomplice testimony. (§ 1111.) There must be sufficient corroborating evidence that "shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (*Ibid*.) The requisite corroboration "must, without

26

aid from the accomplice's testimony, connect the defendant to the charged offense, but may be circumstantial, slight and entitled to little consideration when standing alone. [Citations.] Corroborating evidence need not be sufficient to establish the defendant's guilt or corroborate the accomplice to every fact to which the accomplice testified. [Citations.] It must raise more than a suspicion or conjecture of guilt, and is sufficient if it connects the defendant with the crime in such a way as to reasonably satisfy the trier of fact as to the truthfulness of the accomplice." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1177–1178.) Unless we determine "that the corroborating evidence should not have been admitted or that it could not reasonably tend to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal." (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543.)

Juwan testified that Stoltz fired a .45 caliber gun at the victims and Newsome attempted to fire a .380 caliber gun at the victims, but the gun had jammed. Juwan further testified that Stoltz and Newsome handed him their guns after the shooting and Juwan wrapped these guns along with the .25 caliber gun he had used in his jacket and put them underneath a bush in the area near the shooting. Applying the above principles, we find the following evidence sufficient to corroborate Juwan's accomplice testimony regarding defendants' involvement in the attempted murders of Trenton and Brylowe.

A deputy testified that he took Trenton to an in-field lineup after the incident and Trenton positively identified Stoltz as the driver of the Charger. Another deputy testified that Stoltz was in the driver's seat of the Charger after the incident. Trenton testified that Stoltz and Newsome pointed their guns at his face while they robbed him in the Charger.

27

A deputy testified that bullet holes in the Charger were consistent with the driver, Stoltz, sticking his arm out of the window and firing a gun hitting the hood of the Charger with the bullet then exiting out through the Charger's grill. A bullet hole in the trunk area of the Impala appeared to be from a .45 caliber gun. After the incident, Juwan led deputies to the bush where he had hidden the guns. The guns, which had been wrapped in a sweater, were a .45 caliber Taurus, a .25 caliber Sundance, and a .380 caliber gun of an undetermined brand. The recovered .380 caliber gun had unexpended ammunition in its magazine and a bullet in its chamber.

Thus, excising Juwan's accomplice testimony, we are convinced there was sufficient independent evidence to connect defendants with the commission of the attempted murders.

## V. *Alleged Instructional Error*

A. Gang Related Instructions

1. Background

Defendants were charged with street terrorism and it was alleged that they committed the other crimes to benefit a criminal street gang. At trial, a gang expert testified that in 2006, Yarborough Park Crips gang members Alazado Tuaolo and Nicholas Shipman pleaded guilty to, respectively, grossly negligent discharge of a firearm and residential burglary and both admitted committing the crimes to benefit a gang.

The trial court instructed the jury as to the elements of the gang enhancement and the substantive street terrorism charge. The instructions defined a "pattern of criminal gang activity" for the jury as the commission of "two or more" of the following crimes. The instructions listed "burglary" and "grossly negligent discharge of a firearm and admit crime was committed for

28

the benefit of a criminal street gang" as the crimes that could constitute a pattern of criminal gang activity.

2. Analysis

Defendants contend the trial court erroneously included grossly negligent discharge of a firearm as a pattern offense. The People concede the trial court erroneously included this crime as a pattern offense, but assert the error was harmless because the current offenses qualified as pattern offenses. The People contend the evidence and resulting convictions showed defendants committed two pattern offenses as enumerated in former section 186.22, subdivision (e), namely, robbery and discharging a weapon at a motor vehicle. We disagree that the error was harmless.

"When one of the theories presented to a jury is legally inadequate, such as a theory which ' "fails to come within the statutory definition of the crime" ' [citation], the jury cannot reasonably be expected to divine its legal inadequacy. The jury may render a verdict on the basis of the legally invalid theory without realizing that, as a matter of law, its factual findings are insufficient to constitute the charged crime. In such circumstances, reversal generally is required unless 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.' " (*People v. Brylowe* (2005) 35 Cal.4th 1219, 1233; see also *Griffin v. United States* (1991) 502 U.S. 46, 59; *People v. Guiton* (1993) 4 Cal.4th 1116, 1128.)

The jury convicted defendants of robbery and discharging a weapon at a motor vehicle, two crimes enumerated in former section 186.22, subdivision (e) as pattern offenses. The jury instructions, however, directed the jury that a "pattern of criminal gang activity" meant the commission of "two or more of the following crimes," either "burglary" or "grossly negligent discharge of a

29

firearm and admit crime was committed for the benefit of a criminal street gang." The court never instructed the jury that it could consider robbery or discharging a weapon at a motor vehicle as pattern offenses.

Thus, the jury instructions for the gang enhancements and street terrorism charge in this case permitted the jury to convict defendants of street terrorism and find true the gang enhancements on an improper legal theory. Reversal is required because there is nothing in the record to establish that the jury necessarily rejected the improper legal theory and instead convicted defendants on a proper theory. Accordingly, the street terrorism convictions in count 5 and the true findings on the gang enhancements connected to counts 1, 2, 3 and 4 must be reversed and the matter remanded for resentencing.

B. Unanimity Instruction

1. Background

Stoltz took Trenton's wallet and Juwan took Trenton's wristwatch and a few dollars. Inside the wallet, Trenton had about $60 to $80, his social security card, a gift card from McDonald's and other items. During a subsequent search of the backseat of the Charger, police found Trenton's empty wallet and, among other things, a McDonald's gift card.

2. Analysis

Defendants contend that based on varying testimony as to what was taken from Trenton while he was in the Charger, either the prosecutor should have made an election or the trial court erred in failing to give the jury a unanimity instruction with regard to the robbery charge. We disagree.

A defendant's constitutional right to a unanimous jury verdict requires that when the evidence shows more than one unlawful act that could support a single charged offense, the prosecution must either elect which act it is

relying upon, or the trial court must instruct the jurors sua sponte that they must unanimously agree which act constituted the crime. (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) A unanimity instruction is not required, however " 'when the acts are so closely connected as to form part of one transaction.' " (*Ibid.*) " 'We review de novo a claim that the trial court failed to properly instruct the jury on the applicable principles of law.' " (*People v. Lueth* (2012) 206 Cal.App.4th 189, 195.)

Here, although the evidence shows Stoltz took Trenton's wallet, which contained multiple items, while Juwan took Trenton's wristwatch, the evidence described one continuous course of conduct that lasted only a few minutes. Thus, no unanimity instruction was required. (*People v. Curry* (2007) 158 Cal.App.4th 766, 782 [where defendant took victim's shoes and phone almost simultaneously during an assault, the takings formed a single incident of robbery]; *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1296 [robbery in which defendant stole some of victim's cash, then drove to another location and stole more money; no unanimity instruction required].)

C. Credibility Instruction

1. Background

CALJIC No. 2.20 instructed the jury that "[i]n determining the believability of a witness you may consider anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness," including whether a witness is testifying under a grant of immunity. The instruction also told the jury that it was not limited to the factors listed in the instruction to determine witness credibility. Newsome requested the trial court modify CALJIC No. 2.20 to include a reference to Juwan's plea agreement. The trial court denied the request and instructed Newsome's counsel that he could argue the effects of Juwan's plea agreement.

31

2. Analysis

Defendants assert the trial court erred in refusing to instruct the jury it could consider Juwan's plea bargain in assessing Juwan's credibility. They contend the court's refusal to instruct on Juwan's plea bargain forced trial counsel to argue Juwan was discredited without the benefit of a correct instruction authorizing jurors to do so. Defendants assert they were entitled upon request to an instruction pinpointing the theory of the defense, namely, that Juwan should not be believed. They argue that the failure to inform jurors they could and should consider Juwan's plea bargain in determining his credibility deprived them of their federal constitutional rights, and therefore the judgments of guilt must be reversed because the error was not harmless beyond a reasonable doubt. The trial court did not err in refusing the requested modification.

A defendant is entitled to an instruction which pinpoints a defense theory. (*People v. Wharton* (1991) 53 Cal.3d 522, 570 (*Wharton*).) Such an instruction is one which "pinpoints the evidence in the case in the light of defendant's theory of defense and instructs the jury that the People bear the burden of ultimate persuasion on the issue which the instruction pinpoints." (*People v. Brady* (1987) 190 Cal.App.3d 124, 135, disapproved on another ground in *People v. Montoya* (1994) 7 Cal.4th 1027, 1040.) A court is not required to give a pinpoint instruction that is argumentative, duplicative, or not supported by the evidence. (*People v. Bolden* (2002) 29 Cal.4th 515, 558–559.) A trial court can also refuse instructions that highlight specific evidence because such an instruction " 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence,' it is considered 'argumentative' and therefore should not be given." (*People v. Earp* (1999) 20 Cal.4th 826, 886.)

32

Proper instructions do not pinpoint specific evidence, but rather the theory of the defendant's case. (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.) "[I]nstructions that attempt to relate particular facts to a legal issue are generally objectionable as argumentative [citation], and the effect of certain facts on identified theories 'is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate.' " (*Wharton*, *supra*, 53 Cal.3d at p. 570.) We review de novo the trial court's refusal to give a requested pinpoint instruction. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) In doing so, we consider the instructions as a whole and assume that the jurors are intelligent persons who are capable of understanding and correlating all jury instructions. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

Here, the request to instruct on Juwan's plea bargain highlighted specific evidence (Juwan's plea bargain) and invited the jury to draw the inference that Juwan was not a credible witness based on this specific evidence. The trial court properly rejected the proposed pinpoint modification as argumentative. The requested instruction was also duplicative of CALJIC No. 2.20 which instructed the jury it could consider "anything" tending to prove or disprove the truthfulness of a witness. (*People v. Clark* (2011) 52 Cal.4th 856, 975 ["The court properly may refuse a proposed instruction … when the point is covered in another instruction."].)

Even assuming defendants were entitled to the instruction, any error in not giving it was harmless. In evaluating the impact of the trial court's refusal to give a pinpoint instruction, we consider " 'the entire cause, including the evidence,' " defense counsel's focus in closing argument on the evidence supporting the defense theory, and whether any given instructions would have precluded the jury "from giving that evidence its due weight."

33

(*Wharton*, *supra*, 53 Cal.3d at pp. 571–572.) We review the erroneous failure to give a pinpoint instruction for prejudice under the *Watson* harmless error standard. (*Id.* at p. 571; *Watson*, *supra*, 46 Cal.2d at p. 836.)

First, the absence of a specific reference to the plea bargain in CALJIC No. 2.20 did not preclude consideration of that factor as the instruction expressly permitted the jury to consider anything in evaluating the truthfulness of a witness, including but not limited to the factors listed. Additionally, the trial court thoroughly instructed the jury on the requirement of corroboration for accomplice testimony and to view such testimony with caution. (CALJIC Nos. 3.11, 3.12, 3.18.) Moreover, trial counsel for both defendants cross-examined Juwan about the plea bargain. Both counsel also argued to the jury that the plea bargain Juwan had with the prosecution was incentive for Juwan to lie and provided a reason to question Juwan's credibility.

In summary, the jury instructions, taken as a whole, and considered in conjunction with counsel's argument to the jury, adequately informed the jury of its responsibility to consider all relevant factors in assessing witness believability. Thus, even assuming the trial court erred, the error was harmless.[11]

---

[11] Newsome's challenges to the (1) attempted murder instruction and (2) instruction regarding the premeditation allegations attached to the attempted murder charges and Stoltz's joinders thereto, are moot given our reversal of the attempted murder convictions and vacation of the attached premeditation allegations. (*Ante*, pt. I.)

VI. *Alleged Sentencing Error*

In their initial appellate opening briefs, defendants argued that the trial court erred in not (1) staying the sentence for the robbery and the gang enhancement attached to that crime under section 654 and (2) stating its reasons for imposing consecutive sentences for the attempted murder and robbery charges. These challenges are moot given our reversal of the attempted murder convictions and vacation of the attached premeditation allegations. (*Ante*, pt. I.)

VII. *Mental Health Evaluations*

A. Background

When Juwan was a co-defendant in this proceeding his counsel expressed a doubt about Juwan's competency. The trial court suspended the criminal proceedings and ordered a competency evaluation under section 1368. The psychiatrist prepared a written report and the prosecutor prepared a redacted version of the report to protect Juwan's personal information and attorney-client privilege. Juwan was found to have been malingering and thus competent. The court ordered that the reports be sealed. The trial court had the prosecutor review the reports and provide to defense counsel all possible exculpatory evidence within the meaning of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

Stoltz's counsel asked the trial court to unseal Juwan's psychiatric reports or review them, questioning whether it had followed the proper procedures in ordering the reports sealed. Counsel also asked the trial court to review the redacted and unredacted reports and decide whether the prosecutor was correct in finding no *Brady* material in the reports. The trial court reviewed the reports and concluded that they contained no exculpatory evidence. The court also denied a request to unseal the reports.

B.  Analysis

Defendants do not challenge the sealing of the reports; rather, they request that we review the sealed reports and reverse the judgment if the trial court failed to turn over any documents material to their defense, including but not limited to exculpatory evidence within the meaning of *Brady* or other material evidence subject to mandatory disclosure under section 1054.1.  The People argue psychiatric material is generally undiscoverable prior to trial and we should not independently review the reports because defendants cited no authority for such a review.

Under *Brady*, the prosecution violates a defendant's federal due process rights when it suppresses evidence material to the defendant's guilt or punishment, regardless of the good faith belief of the prosecution.  (*Brady*, *supra*, 373 U.S. at p. 87.)  Prosecutors have a duty to disclose "material exculpatory evidence whether the defendant makes a specific request [citation], a general request, or none at all [citation]."  (*In re Brown* (1998) 17 Cal.4th 873, 879.)  An appellate court's role is to review the confidential records that were not disclosed by the trial court "to determine whether they were material and should have been disclosed."  (*People v. Martinez* (2009) 47 Cal.4th 399, 453.)

On our own motion, we have augmented the record to include copies of the unredacted and redacted versions of the report.  (Cal. Rules of Court, rule 8.340(c).)  The trial court properly sealed these reports and we add them to the record on appeal under seal.  We have reviewed the unredacted and redacted versions of the report in camera and conclude the undisclosed information was not material to defendants' defense and the trial court did not err in denying disclosure.

## DISPOSITION

The attempted murder (counts 1 and 2) and street terrorism convictions (count 5) are reversed as to both defendants. The true findings on the gang enhancement allegations connected to counts 1, 2, 3 and 4 are reversed and the gang enhancements stricken. In all other respects, the judgments are affirmed. The matter is remanded to the trial court for a possible retrial on counts 1, 2 and 5 and the gang enhancement allegations. If the prosecutor elects not to retry one or both defendants, or at the conclusion of any retrial, the trial court is directed to resentence defendants. Thereafter, the trial court is directed to prepare an amended abstract of judgment and to send a certified copy of the same to the Department of Corrections and Rehabilitation.

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

37